## No. 13,784.

### PARISH OF ST. TAMMANY vs. TRANCHINA & OLIVIERI.

#### SYLLABUS.

1. There is no warrant in any act of the Governor or legislative council of the Territory of Orleans, nor of the General Assembly of the State of Louisiana, nor yet in any act of Congress pertaining to the establishment and enlargement of the State of Louisiana, for holding that the southern boundary of the Parish of St. Tammany was ever recognized as extending south of a line drawn through the center of Lake Pontchartrain.

2. "West End" (a suburb of the city of New Orleans located in Lake Pontchartrain near its southern shore and south of the middle line of the lake) is, therefore, held not to be within the limits of the Parish of St. Tammany.

APPEAL from the Twenty-sixth Judicial District, Parish of St. Tammany—*Thompson, J.*

*Wickliffe & Falls,* for Plaintiff, Appellant.

*Gustave Lemle,* for Defendants, Appellees.

The opinion of the court was delivered by

BLANCHARD, J. Does "West End" pertain to the territorial jurisdiction of the Parish of St. Tammany?—is the question here presented.

"West End" is a suburb of the City of New Orleans and has heretofore been considered as within its municipal limits. Accordingly, municipal control and authority have been exercised over it, and the payment of City licenses has been exacted from those pursuing business vocations there falling within the license law.

It is a place of resort for the people of the City, located on or near

the southern shore of Lake Pontchartrain, is reached by a line of electric cars, as well as a steam railway, and by carefully kept drive ways.

Hotels, restaurants, saloons, booths, confectioneries, places of amusement, yacht club houses, bathing houses, etc., are there.

Defendants conducted a restaurant and liquor saloon there and paid the usual license tax to the State and to the City of New Orleans.

But the Parish of St. Tammany, in the year 1899, asserting the locality in question to be included within its boundaries, brought the present action to subject the defendants to the payment of a license tax for that year to the Parish.

The contention of the plaintiff is that the southern shore of Lake Pontchartrain is the northern boundary of the Parish of Orleans; that "West End" is an artificial island erected or constructed about the year 1873 out in the Lake near, but beyond, its southern shore; that being *in* the Lake and not located *on* its southern shore it is outside of the limits of the Parish of Orleans; that the Parish across and north of Lake Pontchartrain at that point is St. Tammany; that the southern boundary line of that Parish is the southern shore of the Lake; and that, consequently, "West End" is part of St. Tammany Parish.

It will be observed, by consulting the map of Louisiana, that this contention would claim for St. Tammany Parish *the whole* of the waters of Lake Pontchartrain, except the western one-fourth thereof.

The defense is that the southern boundary line of St. Tammany is not the southern shore of Lake Pontchartrain, but the middle of the Lake, and that since "West End" is in the Lake south of the middle line thereof, it is not within the limits of the Parish of St. Tammany.

This contention of defendants was sustained by the lower court and from a judgment rejecting its demand the Parish of St. Tammany appeals.

Undoubtedly, the several acts of the General Assembly relating to and defining the territorial limits of the City of New Orleans and Parish of Orleans, locate the northern boundary line of the same *along the shore* of Lake Pontchartrain.

See Act No. 7 of 1870; Act No. 20 of 1882; Act No. 45 of 1896 (present charter).

And it may be that "West End" is not within the territorial limits of the Parish of Orleans, and that an Act of the Legislature amending the present charter of the City of New Orleans, so as to make the

middle of Lake Pontchartrain, and not *its southern shore,* the northern boundary of the Parish of Orleans, is necessary to take it in.

But conceding this to be so, (though as to it opinion is reserved), it does not follow that the whole of Lake Pontchartrain, to its southern boundary, is embraced within the limits of the Parish of St. Tammany.

What concerns us now is, where is the southern boundary of St. Tammany?

If it does not reach to the southern shore of the Lake, it is no concern of St. Tammany, for the purposes of this suit, whether that shore is or not the northern boundary of the Parish of Orleans.

The question, then, is not whether "West End" is within the limits of the Parish of Orleans, but whether it is within the limits of St. Tammany.

The Judge *a quo* held that the southern boundary of the latter parish had never been recognized as extending south of the center of Lake Pontchartrain.

He had ample grounds for this ruling as will appear.

By Act approved February 20, 1811, Congress authorized the people of the Territory of Orleans to adopt a constitution and form a State government.

The act defined the limits of the territory so intended to form a state as follows:—

"Beginning at the mouth of the river Sabine, thence by a line to be drawn along the middle of the said river, including all islands, to the thirty-second degree of latitude; thence due north, to the northernmost part of the thirty-third degree of north latitude; thence along the said parallel of latitude to the river Mississippi; thence down the said river to the river Iberville; *and from thence along the middle of the said, river and lakes Maurepas and Pontchartrain,* to the Gulf of Mexico; thence bounded by the said gulf to the place of beginning." (Italics ours.)

This establishes *the middle* of Lake Pontchartrain as the boundary line between the area then about to be established into a State (Louisiana) and the territory north of the Lake, which was not yet to form part of the State.

That territory was what has since become the Parishes of St. Tammany, Washington and Tangipahoa.

Pursuant to this authority from Congress the people of the Territory of Orleans proceeded to adopt a constitution and it became the first

Constitution of the State of Louisiana—that of 1812. Its preamble defines the boundaries of the new State the same as the Act of Congress had done.

Thus, again *the middle* of Lake Pontchartrain was fixed as the boundary line of the country north of that part of the new State.

Following the adoption of this Constitution, Congress passed the Act approved April 8, 1812, for the admission of the State of Louisiana into the Union. Here again *the middle* of Lake Pontchartrain is given as the boundary line of the territory north of that part of the new State.

Then came, six days later, the Act of Congress approved April 14 1812, entitled "An Act to enlarge the limits of the State of Louisiana." It added to the new State the territory north of Lake Pontchartrain, and other territory.

Its first section enacts:—

"That in case the Legislature of the State of Louisiana shall consent thereto, all that tract of country comprehended within the following bounds, to-wit:—Beginning at the junction of the Iberville with the river Mississippi. thence along the middle of the Iberville, the river Amite, and of the lakes Maurepas and Pontchartrain to the eastern mouth of the Pearl river; thence up the eastern branch of Pearl river to the thirty-first degree of north latitude; thence along the said parallel of latitude to the river Mississippi; thence down the said river to the place of beginning, shall become and form part of the said State of Louisiana," etc.

Its second section enacts that in case the Legislature of the State consents to the incorporation of the territory aforesaid, it shall make provision by law for the representation of the territory in the Legislature.

The Legislature, by Act approved August 4, 1812, accepted this enlargement of territory, and again was *the middle* of Lake Pontchartrain indicated as the southern boundary of that part of the new acquisition bordering on said Lake.

Then followed an Act approved August 25, 1812, "apportioning the representation of that part of Florida annexed to the State of Louisiana." In this act it is again recited that the territory forming that part of Florida (annexed to Louisiana pursuant to the Act of Congress aforesaid) which borders on Lake Pontchartrain has for its southern boundary *the middle* of the lake.

The Act named four parishes, to-wit:—Feliciana, East Baton Rouge,

St. Helena and St. Tammany, as embraced within the Florida acquisition, and apportions senators and representatives to them.

These parishes had first been formed by ordinance or proclamation dated December 22, 1810, of William C. C. Claiborne, Governor of the Territory of Orleans, and subsequently by act of the Legislative Council of the Territory of Orleans, approved April 24, 1811.

In the first of these, the Parish of St. Tammany was described and defined as follows:—

"All that tract of country east of the Pontchatoula, including the settlement of Chiffonta, Bogue Chitto and Pearl River."

Not a word here that would indicate the whole of Lake Pontchartrain, south of the "country east of the Pontchatoula," was intended to be embraced within the limits of the Parish. The lake is not even mentioned. It is the "country"—*i. e.*, the land—"east of the Pontchatoula," including certain settlements, that was to form the parish.

From this language it is far more likely that the *northern* shore of Lake Pontchartrain, rather than its southern shore, was intended to be the southern boundary of the Parish.

In the act of the Territorial Legislature, approved April 24, 1811, the Parish of St. Tammany is briefly described as

" lying east of the Tangipahoa to Pearl river and south of the Mississippi territory."

We think it would be a forced construction that would, from this description, carry the southern boundary of the parish clear across Lake Pontchartrain. We cannot adopt it as the intention of the act.

And, anyhow, we hold that the later Acts of Congress referred to, and that of the Legislature of the State approved August 25, 1812, indicating the middle of Lake Pontchartrain as the boundary of those "Florida parishes" bordering on the lake, had the effect to limit the southern extension of St. Tammany Parish to the middle of the lake.

Judgment affirmed.