19 So.2d 328

### PARISH OF LAFOURCHE v. PARISH OF JEFFERSON.

No. 36759.

June 26, 1944.

Rehearing Denied July 14, 1944.

John E. Fleury, Dist. Atty., and Ernest M. Conzelmann, Asst. Dist. Atty., both of Gretna, for defendant and appellant.

M. E. Culligan, Sp. Asst. Atty. Gen., and Roland B. Howell and Edmond L. Deramee, both of Thibodaux, for plaintiff and appellee.

HAMITER, Justice.

At a meeting held on the 9th day of November, 1938, the Police Jury of Lafourche Parish, through the adoption of Ordinance No. 700, ordained that the boundary line between that parish and the adjoining Parish of Jefferson on the east, concerning which a dispute existed, be definitely ascertained, surveyed, and marked. And in this connection, it designated 10 o'clock a. m. of June 15, 1939, at Des Allemands, Louisiana, as the date and place for commencing the survey, and it named and employed Mr. J. A. Lovell, civil engineer, with full authority to act. Further, it appointed a special committee to represent the Parish of Lafourche.

After being served with a copy of the ordinance on a date more than six months

prior to said June 15, 1939, the Police Jury of Jefferson Parish employed Major Frank T. Payne, civil engineer, as its surveyor, and also appointed a special committee to represent it.

At 10 o'clock on June 15, 1939, at Des Allemands, Louisiana, the hour, date and place designated in the mentioned Ordinance No. 700, the surveyors and special committees of the respective parishes met; but no agreement could be reached regarding a boundary line to be jointly surveyed. Whereupon the meeting was adjourned, and thereafter each engineer proceeded to make his survey, separately from and independently of the other.

The line surveyed by Major Payne, Jefferson Parish's Engineer, commences at a recognized call known as the Temple, this being an old Indian mound located at the junction of Bayou Des Allemands and Lake Salvador (formerly Grand Lake Barataria), and it follows an irregular course in a general southerly direction to a point on the Gulf of Mexico some miles west of Cheniere Caminada. As stated by that engineer, it proceeds along natural water courses and has as its basis the boundary described in an act adopted by the Legislative Council of the Territory of Orleans on April 10, 1805, p. 144, and more particularly delineated on a map prepared by one B. Lafon in the year 1806. Such act and map are hereinafter fully discussed.

On the other hand the engineer employed by Lafourche Parish, Mr. Lovell, fixed the boundary farther to the east, predicating his survey on the provisions of an Act of the Louisiana Legislature approved March 7, 1824, p. 68. The Lovell line, in so far as it concerns the two parishes engaged in this dispute, has its northern terminus at the junction of Lake Salvador and Bayou Perot; then it takes a general southeasterly course, following well-established waterways, to the center of Barataria Pass, located immediately east of Grand Isle, and to the Gulf of Mexico.

Besides establishing that line, Mr. Lovell proceeded to survey and mark the boundary of Cheniere Caminada, and he placed it in Jefferson Parish in accordance with the provisions of the Act of the Louisiana Legislature approved March 15, 1830, p. 64.

Following the completion of the survey of each engineer, which included the preparation of an elaborate proces verbal and map, this suit was instituted by the Parish of Lafourche, it praying under its main demand that "there be judgment in favor of the Parish of Lafourche and against the Parish of Jefferson adjudging, declaring and decreeing that the Act of the Legislature of Louisiana, adopted March 7, 1824, established the boundary line between the Parishes of Lafourche and Jefferson; that the survey of J. A. Lovell with accompanying map as shown by Lafourche Parish Exhibit 3 attached and made a part of this petition is an accurate, true and correct survey of the said boundary line as thus established by said Act of March 7, 1824, and as such the said survey be declared, adjudged and decreed to be a true and correct survey of the boundary line between said parishes."

Defendant excepted to the petition as disclosing neither a right nor a cause of action.

Upon the court's overruling of the exceptions the Parish of Jefferson answered, urging the rejection of the Lovell proces verbal, survey, and map, after asserting that they are highly irregular, untrue and incorrect for numerous assigned reasons; and it prayed that the survey of Frank T. Payne be declared, decreed and adjudged a true and correct establishment of the boundary line between the two parishes.

Thereafter the cause was regularly tried and submitted for adjudication.

In due course the district court rendered judgment on the merits in favor of the Parish of Lafourche and against the Parish of Jefferson, decreeing and declaring that the Act of the Louisiana Legislature of March 7, 1824, established the boundary line between the litigants, and that the proces verbal of J. A. Lovell, with the accompanying map, constituted an accurate, true and correct survey of the disputed boundary. Further, the judgment recites:

"It is further Ordered, Adjudged and Decreed, That: By the force and effect of the Act of the General Assembly of the State of Louisiana, approved March 15', 1830, it is recognized that the 'Cheniere Caminada' constitutes a part of and belongs to the defendant, the Parish of Jefferson; and

"It is further Ordered, Adjudged and Decreed, That, insofar as the petition and prayer of plaintiff may be thought to constitute a demand for the judicial approval and adoption of that part of the Lovell survey that essays to locate and identify the 'actual limits' of Cheniere Caminada, they be and are hereby dismissed as in case of non-suit; and

"It is further Ordered, Adjudged and Decreed That the defendant pay the costs of this proceeding, including the cost of the survey of J. A. Lovell, except that portion of the costs incurred or accumulated by him in his survey of Cheniere Caminada, which costs shall be paid by the plaintiff."

The Parish of Jefferson is appealing.

The exceptions of no right and no cause of action, overruled in the trial court and reurged here, are grounded on the contention that Lafourche Parish did not comply with the provisions of Section 2624 of the Revised Statutes (Act No. 40 of 1855), which read as follows: "Whenever the police jury of any parish shall pass an ordinance for ascertaining and fixing the boundary lines of any parish adjoining thereto, and shall appoint a time and place for commencing the running thereof, and shall duly serve the president of the police jury of said adjoining parish with a copy of the ordinance, with notice of the time and place for commencing the running thereof, six months previous to the time so fixed, then the parish surveyors of said parishes, or such surveyors as may be appointed for that purpose, shall proceed to the running and marking of said boundary line, and in case the parish surveyor of either parish shall fail to attend at the time and place appointed, then the other parish

surveyor, after waiting two entire days, shall proceed to the running and marking of the said adjoining boundary line."

█ In our opinion those provisions were satisfied as fully as was possible under the circumstances that existed; and the exceptions were correctly overruled. Both engineers, along with the two special committees, were present at the time and place designated in Ordinance No. 700. Because of the existence of the disagreement respecting the correct boundary line, it was impossible for them to proceed with a joint survey. Consequently, each went his separate way, running and marking a different line and making preparations for recourse to the courts by his employer, the only remedy remaining.

The case of Caddo v. DeSoto, 114 La. 366, 38 So. 273, 274, cited in the briefs of counsel for both litigants, contains the following appropriate language relative to the statute in question: " * * * It prescribes the course to be pursued by police juries for 'ascertaining and fixing' the boundaries between their parishes and adjoining parishes. We must hold that the mode of proceeding thus enjoined upon the police juries is exclusive, at least to the extent that it must first be resorted to and be exhausted as a remedy before they can apply to the courts; that the having had recourse to it is a condition precedent to the courts."

On the merits of the case, it is to be noticed first that by an Act of Congress of March 26, 1804, 2 Stat. 283, adopted after the purchase from France in 1803 of the lands known as Louisiana, there was created and constituted the Territory of Orleans, and for it a territorial form of government was provided. In part such act stated: "All that portion of country ceded by France to the United States, under the name of Louisiana, which lies south of the Mississippi territory, and of an east and west line to commence on the Mississippi river, at the thirty-third degree of north latitude, and to extend west to the western boundary of the said cession, shall constitute a territory of the United States, under the name of the territory of Orleans; the government whereof shall be organized and administered as follows." Section 1.

In 1805 the Legislative Council of the Territory of Orleans passed an act (approved April 10, 1805) dividing the territory into twelve counties and establishing therein courts of inferior jurisdiction. In so far as pertinent here it provided: "That the said territory shall be and the same is hereby divided into twelve counties, to be called the counties of Orleans, German Coast, * * * Lafourche, * * * and that the said several counties be, and the same are hereby bounded and described as follows, to-wit: The county of Orleans shall comprehend all that portion of country lying on both sides of the river Mississippi from the Balize to the beginning of the Parish of Saint Charles, including the parishes of Saint Bernard and Saint Louis; the county of German Coast shall comprehend the parishes of Saint Charles and Saint John the Baptist, commonly called the first and second German Coasts; * * * the county of Lafourche shall comprehend the parish of Assumption; * * *."

It is well to keep in mind the description given to the County of Orleans in said Act of 1805, for it forms the basis of the survey made by Major Payne, Jefferson Parish's engineer, which we shall hereinafter fully discuss.

With further reference to the Act of 1805, the following extract, which we quote from the brief of plaintiff's counsel, appropriately and correctly states:

"This Act of 1805 dividing the territory into 12 counties refers to certain parishes as constituting some of the counties, and it was the first enactment creating political subdivisions of the Territory of Orleans.

"In referring to certain parishes as forming portions of the 12 counties the legislators had in mind church parishes as created and recognized by the Roman Catholic Church because parishes were not recognized and created as political subdivisions until the Act of March 31, 1807 (Section 9) created 19 parishes.

"The colonial history of Louisiana was influenced mainly by French customs and laws, even during the sovereignty of Spain. French and Spanish colonization of the new world was mainly influenced by the Roman Catholic Church. Priests came with the explorers and colonizers, and they established churches in various settlements, which were given sacred names and were designated as parishes in conformity to the organization of the Roman Catholic Church.

\*      \*      \*      \*      \*      \*

"Each settlement of any consequence in south Louisiana soon had its church, usual-ly designated as a parish, with a priest to preside over the ecclesiastical affairs of the people. These churches had names such as St. Bernard, St. John, St. Charles, St. James, etc. All people living in and around one of these church parishes, or sufficiently near to attend that particular church, belonged to that church parish, and the settlements very often bore the same names as the churches. None of these church parishes had any well defined limits and boundaries. \*      \*      \*

The Act approved March 31, 1807, to which reference is made in the above quotation as creating 19 parishes out of the Territory of Orleans, declared among other things, that:

"Section 9: And Be It Further Enacted, That the said territory shall be and the same is hereby divided into nineteen parishes as follows, to-wit:

"The city of New Orleans with its precincts as they formerly stood, shall form the first parish;

"The parish of Saint Bernard, commonly called the Terre-aux-Beoufs, shall form the second;

"The third parish called the parish of Plaquemines, shall comprehend all that part of the country on both sides of the Mississippi below the parish of St. Bernard as far as Balize;

"The parish of St. Charles shall form the fourth parish;

\*      \*      \*      \*      \*      \*

"The settlement of Lafourche shall be divided into two parishes, the nearest of

which to the river, shall form the eighth parish, under the name of the parish of the Assumption, and shall include one-half of the population;

"The ninth parish shall consist of the other settlements in the lower part of Lafourche, and shall be called the Interior parish."

As a result of the Act of 1807 the County of Orleans was divided into three parishes—Orleans, St. Bernard and Plaquemines; and the County of Lafourche was divided into two parishes—Assumption and Lafourche Interior. (Note—Jefferson Parish was subsequently created out of the western portion of Orleans Parish; Lafourche Interior is now known as Lafourche Parish.)

By the Acts of March 20, 1809, p. 80 and April 10, 1811, c. 19, the Legislative Council made certain changes respecting the boundaries between the Parishes of Orleans, Plaquemines and St. Bernard (the three which comprised the County of Orleans prior to 1807). They did not, however, fix a western boundary for the Parish of Orleans, the westernmost of the three parishes.

In 1812, the year in which Louisiana was admitted into the Union, a Constitution for the State was adopted. Among its provisions was the following: "The State shall be divided in fourteen senatorial districts, which shall forever remain indivisible, as follows; the Parish of St. Bernard and Plaquemine including the country above as far as the land (Des Pécheurs) on the east of the Mississippi and on the west as far as Bernoudy's canal shall form one

district. The city of New-Orleans beginning at the Nuns' plantation above and extending below as far as the above mentioned canal (Des Pécheurs) including the inhabitants of the Bayou St. John, shall form the second district, the remainder of the county of Orleans shall form the third district. * * *" Article 2, § 10.

Later, specifically on February 11, 1825, p. 108, the Louisiana Legislature adopted an Act "to divide the Parish of Orleans and for other purposes," Section 1 of which provided, "That the Third Senatorial District shall form a parish under the name of the parish of Jefferson."

Thus by that enactment Jefferson Parish was created, comprising the Third Senatorial District. It was made up of all of the western portion of the County of Orleans remaining after the First and Second Senatorial Districts had been carved from that County.

Now there arise the questions: What was the western boundary of the County of Orleans and, consequently, of the Third Senatorial District and of Jefferson Parish? Where was the line that separated Jefferson Parish from the adjoining parish on its west, Lafourche Interior (now Lafourche)?

Counsel for the defendant, Parish of Jefferson, in their answer to these questions, insist that such western boundary line was definitely established by the Act of April 10, 1805, which, in creating and describing the original twelve counties, declared that, "The County of Orleans shall comprehend all that portion of country ly-

ing on both sides of the River Mississippi from the Balize to the beginning of the Parish of St. Charles." And they say that defendant's engineer, Major Payne, surveyed that line, using the Lafon map of 1806 and following natural water courses. As before stated the boundary marked by him begins at the call known as the Temple and courses in a southerly direction to the Gulf of Mexico at a point several miles west of Cheniere Caminada.

From a mere reading of the 1805 statute, it is clear that no western limits, sufficient for surveying and monumenting on the grounds, were thereby fixed for the County of Orleans. The Balize referred to therein was a small settlement located near the mouth of the Mississippi River; and St. Charles Parish, to the beginning of which the county extended, was at that time nothing more than a church parish, as Major Payne concedes with no defined boundaries. Hence, it was impossible for Major Payne to determine with any degree of accuracy, from the description so used, the western limits of the County of Orleans.

■ As to the Lafon map used in the running of that survey, it was prepared in the year 1806, at which time the only legislation in existence relating to the counties of the Orleans Territory was the discussed Act of April 10, 1805. That statute, as shown above, fixed no western boundary for the County of Orleans; hence, it was no guide or authority for delineating an accurate and exact boundary on the map as defendant asserts was done. The map is nothing more than what the inscription thereon says it is, namely: "General chart of Territory of Orleans drafted according to the most recent observations by· B. Lafon, Geographical Engineer at New·Orleans." From the historical data contained in the record, it must be said that Lafon was a highly reputable engineer and surveyor. But it is not shown that he possessed any sovereign authority to establish boundaries for the several counties of the Territory of Orleans; neither does it appear that he prepared the map from any independent survey that he made, for no mention is made of field notes or other relevant data. Therefore, the lines as drawn on the map cannot be accepted in proof of the boundary now in dispute.

Aside from what we have just said, Major ·Payne was not in complete agreement with Lafon as to the location of the western boundary of Orleans County. In marking the line on the ground, he used numerous calls not shown on the map; and in one place in his testimony we find him commenting that "Lafon put his survey too far to the east or too far to the west."

Moreover, the record indicates that Major Payne was not entirely satisfied with the boundary which he surveyed. In the trial court he proposed an alternative boundary in the form of a straight line running between two old Spanish grants, the one on the north being the Zeringue tract and that on the south, near the Gulf of Mexico, the Mechaud tract. It is unnecessary for us to discuss this straight line, however, for it is not seriously urged here. Anyway, we find no justification for its proposal.

The survey of Mr. Lovell, Lafourche Parish's Engineer, had as its basis, as before shown, the Act of the Louisiana Legislature of March 7, 1824, the title of which declared it to be "An Act to determine the boundaries between the Parishes of Assumption and Lafourche Interior, and the eastern boundary of the last mentioned parish." Since Jefferson Parish, admittedly, lies immediately east of Lafourche Interior (now Lafourche Parish) we are concerned only with that part of the act purporting to establish the eastern boundary of the latter which reads as follows: "* * * a line drawn from the mouth of Bayou des Allemands, to the mouth of Bayou Pierrot, the right bank of Bayou Pierrot, the half of Petit lac des Canards, the half of the Bayou which unites the last with lake Rond, the half of lake Rond, the half of the Bayou by which the said lake is united to lake des Ilets from thence, the bank of the lake des Islets as far as La Passe a Mondion, the half of the Passe a Mondion as far as the sea, including the Grande Ile, shall constitute the eastern boundary line of the parish of Lafourche Interior, any law to the contrary notwithstanding."

The Lovell line, surveyed pursuant to those provisions, commences at the Temple (above described) which is the junction of Bayou Des Allemands and Lake Salvador (formerly Grand Lake Barataria) and runs across Lake Salvador to the mouth of Bayou Perot (formerly Bayou Pierrot). To this point it serves to separate Lafourche Parish from St. Charles Parish situated on the north; and, since the latter is not a party to this proceeding, we do not determine its correctness.

With the said mouth of Bayou Perot as the northern terminus for the boundary between the Parishes of Jefferson and Lafourche, the Lovell line proceeds along the right bank of Bayou Perot to Little Lake (formerly Petit Lake Des Canard), through the center of that lake to Grand Bayou, through the center of that bayou to Hackberry Bay, through that bay to Creole Pass, through the center of that pass to Creole Bay, across that bay to Fricot Bayou, through the center of that bayou to the northern shore of Bay Des Islettes (formerly Lake Des Islet), along the eastern bank of that bay to Bayou Fifi, across that bayou to Barataria Pass (formerly la Passe a Mondion) through the center of that pass to the Gulf of Mexico. Grand Isle, under the survey, is placed in Lafourche Parish, as it is west of the line. Cheniere Caminada is also west of the line; but it was surveyed separately and placed by Mr. Lovell in Jefferson Parish because of the provisions of the Act of March 15, 1830, hereinafter discussed.

The Act of March 7, 1824, forming the basis of the Lovell line, was the first enactment to propose the establishment of a boundary between the Parish of Lafourche Interior (Lafourche) and the property adjoining it on its east, now Jefferson Parish. To the extent that the line therein described has not been changed by subsequent legislation, and in so far as it is possible of being surveyed and monumented on the

ground, we know of no good reason why the provisions of the 1824 statute are not decisive of such boundary.

Unquestionably, it can be located and marked from the place of commencement, its northern terminus, along the right bank of Bayou Perot, through Little Lake, and through Grand Bayou to Hackberry Bay. Even Major Payne, defendant's engineer, agrees that to such extent the provisions of the Act of March 7, 1824, can be followed; he answered in the affirmative the following question propounded to him: "Major, you have testified, as I understood it, that it is impossible to follow the course or courses of the act of eighteen twenty-four from the point where Grand Bayou enters Hackberry Bay. Is it possible to follow it, the courses shown by the act of eighteen twenty-four, from the point marked The Temple to across Lake Salvador, down Bayou Pierrot, across Little Lake and through Grand Bayou, to where Grand Bayou empties into Hackberry Bay?"

But Major Payne insists that he could not conduct a survey, based on the statutory description, below or south of Grand Bayou. He points out that the act provides for the uniting of that bayou with Lake Rond, and, to quote him, "You couldn't follow that call for the reason it leads into Hackberry Bay, a large and well defined body of water, and not Lake Rond, and, consequently, the survey could not be carried further than that." It was because of that situation that he "turned and made a survey following the water course down as delineated on the Lafon map."

The mentioned Lake Rond is not listed on any of the more recent maps. We do find it, however, on the Lafon map of 1806 and also on a map of the State of Louisiana prepared in 1838 by Catisby Graham of New Orleans from information furnished by the General Land Office and the engineer and Navy Department of the United States. Both of these show it as being an immense body of water, with a large bayou emanating from its northern end and one from its southern end, and they seem to place it in that section now occupied by Hackberry Bay, Creole Pass, and Creole Bay.

Because of those map listings, along with the further fact shown by the record that the land in that locality is nothing but sea marsh subject to erosion and tidal overflow, we are satisfied that in 1824 the mentioned two bays and bayou constituted Lake Rond. Furthermore, we are convinced from the evidence before us that Fricot Bayou, which now connects Creole Bay and Bay Des Islettes, is the identical stream referred to in the Act of 1824 as uniting Lake Rond with Lake des Islets.

From all of this it seems proper to say that that portion of the boundary furnished by the Act of 1824 which begins at the mentioned northern terminus and runs to the north shore of Bay Des Islettes is possible of being surveyed and monumented on the ground. And, since it has not been changed by later legislation to our knowledge and there appears to be no dispute as to its actual marking by plaintiff's engineer, we conclude that the Lovell sur-

vey to that extent is correct and must be approved. In this connection it is pertinent to observe that such boundary is made up of water courses that are easily identifiable and which for fifty or sixty years have been used regularly as a transportation route for light boats.

But we cannot agree with that part of the Lovell line extending from the north shore of Bay De Islettes, along the east bank of that bay, thence through the center of Barataria Pass to the Gulf of Mexico. The boundary given for that locality by the 1824 Act was described as "the bank of Lake des Islets as far as la Passe a Mondion, the half of the Passe a Mondion as far as the sea, including the Grand Ile * * *." That description it will be noticed, does not show which · of the two banks, whether east or west, of Bay Des Islettes was intended as the boundary. Lovell, as shown above, followed the east bank, reasoning that it was nearer the last call (la Passe a Mondion—now Barataria Pass) and hence appropriate under general engineering principles.

■ Our most serious objection to Lovell's survey of this lower portion, however, is that effect was not given by the surveyor to certain legislation enacted after the Act of 1824.

Under the provisions of said Act of 1824, as before shown, Grand Isle was located in Lafourche Parish; but by an amendatory act approved March 22, 1827, p. 156, it was placed in the Parish of Jefferson "until the boundaries of the Parishes of Orleans, Jefferson and Lafourche shall

have been particularly defined by law." This statute reads:

"AN ACT To amend an act, entitled 'an act to determine the boundaries between the parishes of Assumption and Lafourche Interior and the eastern boundary of the last mentioned parish, approved March 7, 1824.'

"Be it enacted by the Senate and House of Representatives of the State of Louisiana, in general assembly convened, That until the boundaries of the parishes of Orleans, Jefferson and Lafourche shall have been particularly defined by law, the island commonly called Grand Isle, shall make part of the parish of Jefferson.

."Sec. 2. And be it further enacted, That all process issued from the parish judge or justices of the peace of the parish of Jefferson, shall be executed on all the bayous, lakes, swamps, or lands, situated back of the high lands and settlements adjoining the parish of Lafourche Interior, until the limits between those two parishes shall have been fixed as aforesaid."

Counsel for plaintiff take the position that the 1827 act made no alteration of the boundary line as shown in the Act of 1824; that its only effect was to give Jefferson Parish civil and political jurisdiction over Grand Isle, together with much of the adjoining swamp lands, until the division line between Jefferson and Lafourche Parishes as fixed in the 1824 act could be actually ascertained, surveyed and monumented on the ground. Then they argue: "* * * The eastern boundary of the Parish of Lafourche was legally established for the

first time by the Act of March 7, 1824. The survey of this boundary by J. A. Lovell, surveyor of the Parish of Lafourche (Lafourche Parish Exhibit 3) is correct, therefore, the conditional placing of Grand Isle and the lands back of the highlands of Bay Lafourche under the jurisdiction of the courts of the Parish of Jefferson by the Act of March 22, 1827, 'until the boundaries of Orleans, Jefferson and Lafourche shall have been particularly defined by law' is no longer operative. It follows that that part of the Act of March 7, 1824 which placed these lands and Grand Isle in the Parish of Lafourche, and which was suspended by the Act of March 22, 1827 until said named boundaries have been particularly defined is no longer suspended, because the condition of the suspension has been satisfied. * * *"

Our view of the Act of March 22, 1827 is quite dissimilar to that expressed by plaintiff's counsel. The phrase, used in that Act, "until the boundaries * * * shall have been particularly defined by law" does not and cannot mean, in our opinion, until an actual marking on the ground of the line of 1824 is performed. Certainly the Legislature would not enact a law the efficacy and endurance of which depended merely on the making of a survey. As a matter of fact a survey of the line of the 1824 statute would have required very little more, perhaps no more, time than that consumed in the passage of the 1827 Act.

Rather we believe that the 1827 Act was adopted because of the existence at that time of much confusion regarding the correct location of the southern portion of the boundary between the two parishes. Strongly influencing this belief are the following circumstances: Before the adoption of the Act of 1824 Cheniere Caminada was situated in the Parish of Orleans, as is specifically shown by the later act of March 15, 1830, when it declared, "That the Chenierè Caminada which was comprised within the limits of the parish of Orleans before the adoption of the act entitled 'an act to determine the boundaries of the parishes of Assumption and Lafourche Interior and the Eastern boundary of the last mentioned parish,' be annexed to the parish of Jefferson, from the passage of this act." Obviously, Grand Isle was likewise in Orleans Parish before 1824, because it lay to the east of Cheniere Caminada. This being true, both were a part of the Third Senatorial District under the provisions of the Constitution of 1812, above quoted. Then in 1825 Jefferson Parish was created out of that Third District. Hence, both Cheniere Caminada and Grand Isle actually were a part of and belonged to Jefferson Parish in 1827, notwithstanding the boundary provisions of the Act of 1824. It was because of the existence of this confusing situation, undoubtedly, that the Act of 1824 was amended by the Act of 1827 so as to place Grand Isle in Jefferson Parish where it belonged until the boundaries "shall have been particularly defined by law" or, in other words, until the Legislature could enact legislation definitely establishng the correct boundary in that locality.

Three years later, by the above quoted Act of 1830, specific recognition was given to the fact that Cheniere Caminada, formerly within the Parish of Orleans, was a part of Jefferson Parish; and it was formally annexed thereto.

In numerous subsequent acts of the legislature dealing with Justices of the Peace and Police Jurors of the Parish of Jefferson, both Grand Isle and Cheniere Caminada were recognized as being within and a part of Jefferson Parish. The last of these, which was Act No. 92 of 1884, vested the governmental affairs of Jefferson Parish in one Police Jury of nine members (previously there were two Police Juries in the parish); it divided the parish into nine particularly designated and described police jury wards; and it repealed all laws inconsistent with or contrary to its provivisions. The description given to the sixth ward is "all that portion of the Parish of Jefferson, right bank, not included in the aforesaid wards, and extending to the Gulf of Mexico, including Barataria, Grand Terre, Cheniere, Caminada and Grand Isle."

■ Therefore, in view of the mentioned Acts of 1827 and 1830 and of those subsequently enacted, it is our conclusion that the boundary between the Parishes of Lafourche and Jefferson must be located so as to place within and as a part of Jefferson Parish both Cheniere Caminada and Grand Isle.

But the exact location to be given the southern portion of the line, which obviously must run on the west side of Cheniere Caminada commencing at the mouth of Fricot Bayou at the north shore of Bay Des Islettes and ending at the Gulf of Mexico, is not made clear by any legislative enactments of which we have knowledge or by any evidence in the record presently before us. If there existed a definite call on said west side of Cheniere Caminada—one established by the Legislature— we would be justified, under the authority of engineering principles and of law, in connecting it with the call on the north shore of Bay Des Islettes by a straight line, thereby fixing the boundary; but no such established call seems to exist.

■ We notice that on the official map of the State of Louisiana prepared in 1937 by the Board of State Engineers and also on the 1935 map of the U. S. Coast and Geodetic Survey there have been drawn certain broken lines in representation of parts of a boundary located in accordance with our above suggestion. Undoubtedly the engineers, in preparing those maps and in placing thereon the broken lines, had in their possession certain evidence that has not been brought to our attention and which is not before us. It may be that such evidence can be obtained and furnished to the court, and by it there can be judicially established the correct boundary running from the north shore of Bay Des Islettes to the Gulf of Mexico, passing west of Cheniere Caminada. To this end and for this restrictive purpose, therefore, the case will be remanded.

For the reasons assigned the judgment of the district court is affirmed to the extent that it decrees the following described line, surveyed and monumented by J. A.

Lovell pursuant to the provisions of the Act of March 7, 1824, to constitute a true and correct partial boundary between the Parishes of Lafourche and Jefferson, to-wit: Commencing at the junction of Lake Salvador and the right bank of Bayou Perot, and running along the right bank of Bayou Perot to its junction with the eastern shore of Little Lake a distance of 15 miles; thence through the center of Little Lake to the center of Grand Bayou opposite Observation Stations Nos. 1 and 2, a further distance of 10.1 miles; thence with the center of Grand Bayou in a southeasterly direction to Hackberry Bay opposite U. S. Coast and Geodetic Survey Triangular Station "Ran" and Observation Station No. 15; thence in a southerly direction through Hackberry Bay to Creole Pass, opposite Observation Station No. 8; thence continuing through the center of Creole Pass to Creole Bay; thence crossing Creole Bay to Fricot Bayou; thence with the center of this bayou to the north shore of Bay Des Islettes opposite U. S. Coast and Geodetic Survey Triangular Station "Got", a further distance of 14.4 miles.

The judgment is also affirmed in so far as it recognizes Cheniere Caminada as being within and a part of the Parish of Jefferson, and it dismisses, as of non-suit, plaintiff's demand "for the judicial approval and adoption of that part of the Lovell survey that essays to locate and identify the actual limits of Cheniere Caminada."

In all other respects the judgment of the district court is reversed and set aside.

And it is now ordered, adjudged and decreed that Grand Isle be recognized as constituting a part of and belonging to the Parish of Jefferson. Further, it is ordered that this case be remanded to the district court for additional proceedings in accordance with law and consistent with the views herein expressed.

All costs of both courts and the cost of the two surveys shall be paid in equal proportions by plaintiff and defendant.