58 So.2d 197

**UNITED GAS PIPE LINE CO. v. MOISE, Sheriff.**

**No. 39882.**

Feb. 18, 1952.

Rehearing Denied March 24, 1952.

Kemble K. Kennedy, Baton Rouge, Wilkinson, Lewis & Wilkinson, Shreveport,

Sholars, Gunby & Guthrie, Monroe, for defendant-appellant.

Bolivar E. Kemp, Jr., Atty. Gen., and Adolph Menuet, Jr., Special Ass't Atty. Gen., for defendants.

HAMITER, Justice.

Although tried in separate courts and before different judges, this cause and cause No. 40,564, entitled United Gas Pipe Line Company v. Ralph A. Dubroca, Sheriff and Ex-Officio Tax Collector of St. Charles Parish, 220 La. 991, 58 So.2d 204, have been consolidated on the appeals inasmuch as they present the same issues. We shall discuss them together.

The suits, instituted under the provisions of Act No. 330 of 1938, LSA–R.S. 47:1575, 47:1576, 47:2110, have for their purpose the recovery of ad valorem taxes (state, parish wide, road district and levee district) paid under protest on plaintiff's 14″ gas pipe line (25.30 miles in length) which traverses and is situated in Lake Pontchartrain, entering it from the south at a point in Ward 3 of St. Charles Parish and leaving it on the north at a point in Ward 4 of St. Tammany Parish. In each of those parishes assessments had been made on one-half (12.65 miles) of the line on the theory that the parish boundary extends to the middle of the Lake. Plaintiff disputes the correctness of the theory and takes the position in the suits that the southern boundary of St. Tammany Parish is the northern shore of Lake Pontchartrain and the northern boundary of St. Charles Parish is the Lake's southern shore; and, therefore, that the pipe line lying on the bed of Lake Pontchartrain is situated in neither of those parishes and the taxing authorities thereof are without right to impose and collect taxes on it.

There is no dispute concerning the title to the bed of Lake Pontchartrain, all parties agreeing that it is in the State of Louisiana of which the Lake forms a part. The contest is solely one in boundary. It is unusual in that the parishes agree as to where their respective boundaries are located, whereas a third party (this plaintiff) challenges the correctness of that location. The latter insists that although the area between the shores of Lake Pontchartrain is within the State of Louisiana, it is without the limits of any political subdivision of the State.

In the St. Tammany Parish suit (Numbered 39,882 here) the district judge concluded that the boundary of that parish extended to the center of Lake Pontchartrain. And he rendered judgment denying recovery for the taxes paid by plaintiff, except as to those levied and collected for Road District No. 4 of such parish. Regarding the latter he ordered a refund, with interest thereon at the rate of 2% per annum from the date of payment. From the judgment plaintiff appealed. The defendant tax collector has answered the appeal, praying that plaintiff's demand in its entirety be rejected.

In the St. Charles Parish suit (Numbered 40,564 here; 220 La. 991, 58 So.2d 204) the district judge held that such parish was bounded by the shore or bank of Lake Pontchartrain, not by the Lake's center. And he ordered a refunding to plaintiff of all taxes (state, parish wide, road district and levee district) paid by it under protest, the amounts refunded to bear interest of 2% per annum from the respective dates of payment. The defendant tax collector appealed from the judgment.

It appears from a stipulation of facts with annexed exhibits, on which both causes were largely tried, that in 1941 plaintiff applied to the State of Louisiana for a right of way across Lake Pontchartrain on which it proposed to construct the 14″ pipe line in question, it to extend from the Parish of St. Charles to the Parish of St. Tammany. In accordance with the application, the State granted the right of way "over and through the bed of Lake Pontchartrain which is situated within St. Tammany Parish and Orleans Parish, Louisiana." (Obviously, the mention of Orleans Parish was an error, a map attached to the deed showing the southern terminus to be in St. Charles Parish.) During the latter part of 1941 the pipe line was completed on the right of way applied for and received.

Thereafter plaintiff made a return to the Louisiana Tax Commission of the pipe line across Lake Pontchartrain and the valuation thereof for the year 1942. In the return it conceded that the line was subject to taxation by the State of Louisiana (the Lake being in and a part of the State); but it denied liability for parish, municipal, ward and special district taxes on the ground that the Lake's bed was not located in any such political subdivisions. The Tax Commission agreed with plaintiff's position; however, because the law provided no means for assessment and collection of state taxes other than by parish authorities it decided, as a matter of expediency, that one-half of the 25.30 miles of line should be assessed in each of the Parishes of St. Charles and St. Tammany, with plaintiff being required to pay only the state millage and the general alimony parish tax of four mills, the latter for the purpose of compensating the parishes for assessing and collecting the state tax. Accordingly, in written statements, the Tax Commission instructed the Assessors of the two parishes that the pipe line was subject to the state and the general parish four mill taxes only.

Acquiescing in this decision, plaintiff amended its original return to list one-half of the line (12.65 miles) as being in each of the mentioned parishes. In further acquiescence plaintiff returned for the year 1943 one-half of the valuation in each parish with the notation that "This item, 12.65 miles 14″ pipe in Lake Crossing is subject to State and General Parish alimony taxes only; is not subject to any Ward, Municipal, District or special Parish Taxes."

Subsequently, however, the Supervisor of Public Funds, relying upon an opinion of the Attorney General (dated November 12, 1943), instructed the Assessors of St. Tammany and St. Charles Parishes that all school, road and other special taxes, in addition to the state and general parish alimony taxes, must be assessed and levied on the line crossing Lake Pontchartrain in the two parishes. Thereupon, supplemental assessments for the years 1942 and 1943 were made, and plaintiff paid all taxes under protest. These suits for a refund thereof followed.

By agreement, additional taxes likewise assessed and paid for later years are to be governed by the final decisions in these suits.

In determining the principal question presented by this litigation, which is whether or not the boundaries of St. Tammany and St. Charles Parishes extend into Lake Pontchartrain, consideration must be given to historical data, treaties, proclamations, legislative enactments, constitutional provisions, public documents and maps, many of which are made a part of the record before us.

On February 10, 1763, France, Great Britain and Spain, the early possessors of Lake Pontchartrain and adjacent territory, signed (along with Portugal) the Treaty of Paris which brought to a close the French and Indian War, known also as the Seven Years' War. Included in the treaty, and pertinent here, were the following provisions:

"Article VII. In order to re-establish peace on solid and durable foundations, and to remove forever all motives for dispute respecting the limits of the French and British territories on the American continent, it has been agreed that the limits between the states of his most Christian majesty and those of his Britannic majesty, in that part of the world, shall hereafter be irrevocably *fixed by a line drawn along the middle of the river Mississippi, from its source to the river Iberville; and thence by another line through the middle of that river, and of the Lakes Maurepas and Pontchartrain, to the sea;* and for that purpose, the most Christian king cedes to his Britannic majesty, and guarantees to him, the entire possession of the river and the port of Mobile, and of all that he possesses or should have possessed on the left bank of the river Mississippi; with the exception of New Orleans, and of the island whereon that city stands, which are to remain subject to France; * * *" (Italics ours)

Thus, by these treaty provisions, an international boundary line was definitely established between the colonial possessions of France and Great Britain, it running through the middle of Lakes Maurepas and Pontchartrain to the sea.

On August 18, 1769, all of the territory acquired by France under the Paris Treaty (known as Province of Louisiana) was formally transferred to Spain. It remained in Spanish possession until retroceded to France in 1800.

The United States acquired the Province of Louisiana from France in 1803, the acquisition being often referred to as the Louisiana Purchase. And out of the Province there was created, by an act of Congress of March 26, 1804, 2 Stat. 283, the Territory of Orleans. The Act recited:

"That all that portion of country ceded by France to the United States, under the name of Louisiana, which lies south of the Mississippi territory, and of an east and west line to commence on the Mississippi river, at the thirty-third degree of north latitude, and to extend west to the western boundary of the said cession, shall constitute a territory of the United States, under the name of the territory of Orleans; * *."

An Act of the Legislature of the Orleans Territory, approved April 10, 1805, divided the Territory into twelve counties and established therein courts of inferior jurisdiction. The counties, in the statute, were referred to as comprehending certain named parishes. However, by the reference the legislators evidently had in mind church parishes; because in a later act, approved March 31, 1807, nineteen separate political subdivisions called parishes were specifically created out of the Territory of

Orleans. See Parish of Lafourche v. Parish of Jefferson, 206 La. 615, 19 So.2d 328. But be that as it may in neither of those acts does it appear that any part of the Territory was excluded in effecting the divisions.

On February 20, 1811, 2 Stat. 641, an Act of Congress was approved which purposed " * * * to enable the people of the Territory of Orleans to form a constitution and state government, and for the admission of such state into the Union, on an equal footing with the original states, and for other purposes."

Pursuant to this authority the people of the Territory of Orleans formed, in 1812, a Constitution; and in the preamble thereof they included a description of the boundaries of the proposed State of Louisiana as follows:

" * * * beginning at the mouth of the river Sabine, thence by a line to be drawn along the middle of said river, including all its islands, to the thirty second degree of latitude—thence due north to the Northernmost part of the thirty third degree of north latitude—thence along the said parallel of latitude to the river Mississippi—thence down the said river to the river Iberville, and *from thence along the middle of the said river and lakes Maurepas and Pontchartrain to the Gulf of Mexico*—thence bounded by the said Gulf to the place of beginning, including all

Islands within three leagues of the coast * * *." (Italics ours.)

By an Act of Congress of April 8, 1812, 2 Stat. 701, approval was given for the admission of the State of Louisiana into the Union, the recited description of its boundaries being the same as that contained in the above quoted preamble of the 1812 Constitution. The middle of Lake Pontchartrain, it is important to notice, was declared to be one of the State's boundaries.

Reverting to a consideration of the colonial territory ceded to Great Britain under the Treaty of Paris of 1763, the lower boundary of which was a line through the middle of Lakes Maurepas and Pontchartrain to the sea, that portion known as West Florida remained under British control until 1779 when Spain acquired it by conquest and went into possession thereof. In 1810, while still possessed by Spain, a part of West Florida was seized by W. C. C. Claiborne, Governor of the Territory of Orleans, pursuant to the direction of President Madison who contended that since 1803 it had been within the colony of Louisiana. And by two proclamations issued in December, 1810, Governor Claiborne designated the seized territory as the County of Feliciana and ordained that there be established within such county four parishes.

Later, an act of the Legislature of the Orleans Territory, approved April 24, 1811, divided the County of Feliciana into the following six parishes: Feliciana, East Baton Rouge, St. Helena, St. Tammany, Biloxi and Pascagoula. St. Tammany Parish was described therein as "lying East of the Tanchipao to Pearl-River and South of the Mississippi Territory." The act clearly left no portion of Feliciana County undivided, for the last parish created thereby (Pascagoula) was described as "lying South of the Mississippi Territory and extending East from the River falling into the bay of Biloxi, *including all the remainder of the County of Feliciana.*" (Italics ours)

As stated in the above referred to stipulation of counsel, " * * * The Act of Congress, approved February 11, 1811, authorizing the people of the Territory of Orleans to form a constitution and state government and providing for admission of such state to the Union, omitted from the boundaries of the contemplated new state the area included in the County of Feliciana which Governor Claiborne had but recently taken possession of as part of the Territory and divided into parishes, pursuant to presidential proclamation. Considerable opposition to and disapproval of President Madison's action in this regard had been voiced in Congress and opposition, as well, to admission of the new State of Louisiana. Also, an effort was then being made to form another new state from the conjoined area of the County of Feliciana or West Florida and the Mississippi Territory. And there was strong opposition on the part of some Louisianians to inclusion of Feliciana.

At the convention which met in New Orleans to frame a constitution for the new State of Louisiana, a motion to amend the preamble to the constitution, defining the limits of the State, so as to embrace that county was rejected. However, a memorial to Congress requesting the annexation of that area to the new state to be erected was adopted by the convention. Because of asserted parliamentary difficulties, Congress refused to extend the boundaries as requested in the Act, approved April 8, 1812, admitting Louisiana to statehood, which became effective on April 30th, but by Act approved April 14th [2 Stat. 708], six days later, it was provided that all that portion of West Florida or Feliciana County lying to the west of the eastern branch of Pearl River 'shall become and form a part of the said State of Louisiana, and be subject to the constitution and laws thereof, in the same manner and for all intents and purposes as if it had been included within the original boundaries of the said State', provided that 'The Legislature of the State of Louisiana shall consent thereto'. Such consent was given by the Louisiana Legislature by resolution adopted at its first ensuing session and approved August 4, 1812. * * *"

The mentioned Act of Congress approved April 14, 1812, specifically described the portion added to the State of Louisiana as follows:

" *  *  *  Beginning at the junction of the Iberville, with the river Mississippi; *thence along the middle of the Iberville, the river Amite, and of the lakes Maurepas and Pontchartrain to the eastern mouth of the Pearl river;* thence up the eastern branch of Pearl river to the thirty-first degree of north latitude; thence along the said degree of latitude to the .river Mississippi; thence down the said river to the place of beginning, * * *." (Italics ours.)

And the acceptance resolution adopted by the Louisiana Legislature contained the identical description.

A like description is found in a later Act of the Louisiana Legislature, August 25, 1812, which provided for representation in the General Assembly of the State to be given to the annexed territory, at that time known as the Florida Parishes and consisting of Feliciana, East Baton Rouge, St. Helena and St. Tammany Parishes.

From the foregoing descriptions it must be concluded that the thread or center (medium filum aquae) of Lake Pontchartrain was the dividing line between that portion of the original State of Louisiana bordering on the Lake and the territory later annexed. And it follows logically that the parishes created in those respective areas were similarly bounded, unless some provision of law has clearly declared otherwise.

Certainly the various laws hereinabove considered contain no such declaration. Plaintiff's counsel, however, say that later statutes excluded any portion of the Lake

from the limits of Orleans, Jefferson and Tangipahoa Parishes by bounding those subdivisions by the "shore of the Lake" or "along the Lake", they referring to Acts No. 82 of 1869, No. 7 of the First Extra Session of 1870 and No. 92 of 1884. And they argue "that it could not have been within the legislative intendment that the entire bed of the Lake should be apportioned to the Parishes of St. Tammany, St. John the Baptist and St. Charles because the Lake boundary was not mentioned in the statutes of their creation."

■ It is true that in the named acts the shore of Lake Pontchartrain is given as a boundary for parts of the Parishes of Orleans, Jefferson and Tangipahoa. But it can well be concluded that the legislators, when referring to the shore, had in mind designating the Lake as the boundary and including it in the descriptions. In several cases this court has held that when the Legislature referred to the bank or shore of a stream, bayou or lake as a boundary the presumption (in the absence of a clear indication to the contrary) is that the thread or middle thereof was intended. The basis for the presumption is that no legislative purpose or motive can be perceived for the exclusion of a part of the water course from the territory being bounded. See Parish of Red River v. Parish of Caddo, 118 La. 938, 43 So. 556; Parish of Caddo v. Parish of DeSoto, 119 La. 120, 43 So. 978; Parish of Bossier v. Parish of Bienville, 130 La. 429, 58 So. 137.

The presumption, it seems to us, is particularly applicable to the instant situation. Without it in the above cited cases, which were disputes between parishes, the bodies of water concerned would have fallen necessarily in one parish or the other. But if it be inapplicable here a sizable segment of the State of Louisiana may not be in any parish. And there appears no good reason for the Legislature's intentionally leaving such a large area of the state without the supervision and control of such a political subdivision. Indeed, it seems highly improbable that it would do so.

Irrespective of the presumption, however, it is apparent that the Legislature itself has interpreted the above discussed "shore" references as meaning the center or middle of the Lake. The case of Parish of St. Tammany v. Tranchina, 105 La. 610, 30 So. 109, 111, concerned the southern boundary of St. Tammany Parish. The Parish contended that such boundary was the south shore of Lake Pontchartrain; and that defendant's place of business, located at New Orleans' West End on an island in the Lake near that shore, was within its boundaries and subject to its license taxes. The defense was that the southern boundary of St. Tammany Parish was the middle of the Lake, not the southern shore thereof. The court held that certain Acts of Congress and of the State Legislature (referred to supra), "indicating the middle of Lake Pontchartrain as the boundary of these 'Florida parishes' bordering on the lake,

had the effect to limit the southern extension of St. Tammany parish to the middle of the lake." In the course of its opinion, the court observed that the several Acts of the General Assembly relating to and defining the territorial limits of the City of New Orleans and Parish of Orleans located the northern boundary line of those political subdivisions along the south shore of Lake Pontchartrain. It then said:

"* * * And it may be that West End is not within the territorial limits of the parish of Orleans, and that an act of the legislature amending the present charter of the city of New Orleans so as to make the middle of Lake Pontchartrain, and not its southern shore, the northern boundary of the parish of Orleans, is necessary to take it in. * * *"

In response to this suggestion the Legislature during the following year adopted Act No. 216 of 1902 which provided, among other things, that all of the inhabitants of the Parish of Orleans were thereby created a body corporate and established as a political corporation by the name of "the City of New Orleans". And in describing the boundaries of the Parish of Orleans, with respect to the Lake Pontchartrain area, it said:

"* * * thence along the division line between the Parish of Orleans and the Parish of Jefferson to the South shore of Lake Pontchartrain, and thence to a point in the middle of Lake Pontchartrain on the projected said Parish division line, and thence along the centre of Lake Ponchartrain to the centre of the Rigolets, and thence along the centre of the Rigolets to Lake Borgne, * * *."

This description was repeated in subsequent amendments to the Charter of the City of New Orleans, Act No. 159 of 1912 and Act No. 82 of 1932.

By the Act of 1902, as we appreciate it, the Legislature interpreted its own language in the former statutes which the Tranchina case had placed in doubt, and it gave recognition to the boundaries of Orleans Parish as they theretofore and then existed.

Plaintiff's counsel direct our attention to various maps introduced in evidence, and they say that none shows the boundaries of any of the parishes abutting Lake Pontchartrain as being in the center of the Lake. It can be said correctly also that none, with the exception of the W. J. Hardee map (principally relied on by plaintiff), discloses the boundaries to be the shore of the Lake.

The Hardee map was prepared in 1895 pursuant to the provisions of Act No. 143 of 1894, pertinent portions of Sections 1 and 2 of which are:

"* * * That the Governor of the State of Louisiana be and he is hereby authorized for and in the name of the State of Louisiana to enter into a contract with William Joseph Hardee, civil

engineer, to furnish the State of Louisiana with six hundred copies (mounted) of a new and improved official map of the State of Louisiana for the use of the officers of the State, State institutions and parishes, and public schools thereof * * * to be delivered to the Secretary of State, at the capital, during the year 1895, or when completed.

"* * * That the said map * * * shall contain all the data and information now found in the official map of the State of Louisiana, executed by Thomas S. Hardee, and published in the year 1871, and in addition thereto shall show * * * all removals of parish seats, all new parishes and corrected parish boundaries * * * the area of each parish * * * all to be clearly set forth and to be executed in first-class workmanship and material to the satisfaction of the Governor of the State of Louisiana, who shall thereupon approve the same and endorse thereon his approval as being the official map of the commonwealth."

Reference to the Hardee map is made in the General Revenue Act of Louisiana, Section 11 of Act No. 170 of 1898, LSA-R.S. 47:1952, as follows:

"* * * That when a line between two parishes divides a tract of land, or plantation, each portion shall be assessed in the parish in which it lies; all movable property shall be assessed in the parish or district where it is located,

except as hereinafter provided. Provided, that when the line of parishes are in dispute as to their real location, the lines as shown by 'Hardee's Map' of 1895, shall be the line for assessment purposes and the parish or parishes affected thereby shall be governed by such lines unless a court having competent jurisdiction shall decree otherwise."

These provisions of the General Revenue Act obviously were not intended as a legislative approval of the boundary lines shown on the Hardee map. In fact, they imply that some of the lines might be incorrect, the right of the courts to so hold being therein recognized. By the provisions the Legislature merely intended that in a boundary contest between two parishes the property in the disputed area should not be subject to taxation by both parishes. In such a situation the contesting parishes, for assessment purposes, would be governed by the lines of the Hardee map unless the courts ordered otherwise.

If then the lines on the Hardee map which separate parishes can be judicially declared erroneous, surely it must be said that the boundaries shown thereon for the parishes abutting Lake Pontchartrain are not decisive of this litigation.

Also of no great importance in determining the Lake boundaries of the respective parishes involved herein is the fact that the police juries thereof have fixed the limits of some of their wards at the Lake shore.

With reference to this, and also to the maps above discussed, the judge of the St. Tammany Parish Court has correctly commented:

"* * * The answer to this is that the Police Jury is without power or authority to limit the territorial extent to the Parish of St. Tammany by defining the boundary of the wards of said parish. The same can be said for the various maps and other testimony which seeks to limit the parish to 896 square miles. After all a map is nothing more than the idea of the person who drew it, as to the territorial limits of the Parish of St. Tammany, and certainly no map could stand in the face of legislative enactment and court decree. This is true even of the Hardee map, which was not even mentioned by the Supreme Court in the Tranchina case, supra. * * *"

It is our opinion, therefore, that the boundaries of the Parishes of St. Tammany and St. Charles extend to the middle of Lake Pontchartrain. This being true, and since no contention is made that the pipe line on the bed of the Lake is in any other parish or parishes, the plaintiff is not entitled to a refund of either the state or parish wide taxes paid by it under protest to the original defendants in these suits or to their successors in office who have been made parties litigant.

A refund of taxes levied and collected for Road District No. 4 of St. Tammany Parish, with 2% per annum interest thereon from the date of payment, was properly ordered, we think. Clearly, no part of this road district extends into the Lake, for when created the boundary thereof was specifically limited to the shoreline by numerous definite and well described calls. And the interest awarded is authorized by Section 2(a) of Act No. 330 of 1938, LSA–R.S. 47:1576.

We are of the opinion also that plaintiff is entitled to a refund of the taxes paid under protest in St. Charles Parish for Road District No. 3 and Pontchartrain Levee District (a total of $2664.72), together with the mentioned 2% per annum interest thereon.

Road District No. 3 is composed of all that portion of the Parish of St. Charles lying and situated on the left bank of the Mississippi River known as Wards 3 and 5, and these two wards consist of *"all land"* included in certain described boundaries. The pipe line lying in Lake Pontchartrain, therefore, is not within the road district.

The Pontchartrain Levee District, established by Act No. 95 of 1890, included that part of St. Charles Parish lying east of the Mississippi River. The statute authorized the levying of a tax pursuant to Article 214 of the Constitution of 1879, as amended in 1884, the latter of which recited that the tax was "not to exceed ten mills on the taxable property *situated within alluvial portions of said districts subject to overflow.*" This italicized provision, obviously,

did not contemplate the waters of Lake Pontchartrain.

For the reasons assigned the judgment appealed from in this cause (No. 39,882) is affirmed.

HAWTHORNE, J., takes no part.